Submitted on record and briefs January 23, 1998, reversed in part; otherwise affirmed March 24, 1999

Carroll J. BAYLINK
and Katherine H. Baylink,
husband and wife,
*Appellants,*

*v.*

Carl A. REES
and Della Mae Rees,
husband and wife,
and Leslie E. Tipton and Diana Dominquez,
*Respondents.*

Carl A. REES
and Della Mae Rees,
husband and wife,
and Leslie E. Tipton and Diana Dominquez,
*Third-Party Plaintiffs - Respondents,*

*v.*

Victor W. MORRIS
and Phyllis M. Morris,
husband and wife,
and Daniel L. Morris and Peggy A. Morris,
husband and wife,
*Third-Party Defendants - Respondents.*

(93-11-35914; CA A96061)

977 P2d 1180

D. Rahn Hostetter filed the briefs for appellants.

Bruce E. Anderson filed the brief for respondents Carl A. Rees, Della Mae Rees, Leslie E. Tipton, and Diana Domînquez.

Victor W. Morris and Phyllis M. Morris filed the brief *pro se* for third-party defendants - respondents.

No appearance for third-party defendants - respondents Daniel L. Morris and Peggy A. Morris, huband and wife.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Linder, Judge.

DEITS, C. J.

**DEITS, C. J.**

Plaintiffs Carroll and Katherine Baylink seek review of a trial court judgment granting a nonexclusive easement to defendants Carl and Della Mae Rees and Leslie Tipton and Diana Dominquez for ingress and egress over a road that is on a 30-foot-wide strip of land owned by the Baylinks. On *de novo* review, we affirm in part and reverse in part.

This case involves properties in Union County, near Summerville, that were once a single parcel of land owned by Lawrence and Eleanor Starr and Don and Lynn Starr (the Starrs). The Starrs purchased the property in 1968. They began subdividing the land in 1970. In that year, they conveyed an eight-acre parcel in the northwest corner of the property to Roger and Elizabeth Morris, who later divided their property into two parcels. Victor and Phyllis Morris now own the western portion (the Victor property) and Daniel and Peggy Morris now own the eastern portion (the Morris property). There is no dispute that the two Morris parcels have an easement for ingress and egress over the road that is at issue here.

In 1972, the Starrs conveyed a 16-acre parcel south of the Morrises' parcels to Ambrose and Charlotte Denfeld. The Denfelds divided their property into two parcels of approximately eight acres each. They conveyed the southern parcel to Carl and Della Mae Rees in 1977 (the Rees property). The Denfelds rented out the northern parcel for a number of years. Gerald Jackman purchased the northern parcel in 1984. The Jackman parcel was conveyed to Leslie Tipton and Diana Dominquez in 1992 (the Tipton-Dominquez property).

In 1976, Starr conveyed the remaining eastern parcel to his son, Donald Starr. In 1979, Starr also conveyed to Donald a strip of land lying between the Morris southern boundary and the Tipton-Dominquez northern boundary.[1]

---

[1] This strip was created in 1972, because Starr had measured the Morris property from the existing northern fence line and the Denfeld's property from the southern property line. Because the northern fence line was actually north of the true property line, the effect of this was to create a strip of "extra" land, 30 feet

On the same day, Donald conveyed all of his interest in the eastern parcel and the strip to the Baylinks. The Baylinks did not live on the property. Katherine and their son, Todd, commuted to the property to farm it and they used the road on the strip to reach their land.

The road at issue has been at its current location since about 1972. The fence between the road and the Tipton-Dominquez property has four gates opening onto the road. One is to the north and another to the east of a barn on the Tipton-Dominquez property, the third gate is just past the "dogleg," and the last is near the top of the road. Apparently, the southern fence was built by one of Denfeld's renters shortly after Denfeld purchased the property.

Since the time that this property was subdivided, a number of disagreements have arisen between the landowners concerning the boundaries of the various properties and the use of the road across them. In November 1993, the Baylinks brought an action to quiet title to the 30-foot strip of land on which the road is located. Defendants raised a number of counterclaims and defenses, including an allegation that they had established a prescriptive right to use the road on the 30-foot strip for ingress and egress. The trial court

wide, which Starr retained for himself. The trial court judgment reestablished the correct northern property line and in doing so appeared to make the Morrises' properties smaller than they had believed them to be. As we will discuss, the trial court also concluded that Starr had fee ownership of the strip. However, the trial court's holdings on these questions are not challenged on appeal.

entered judgment declaring what it determined to be the proper legal description of each parcel and establishing the boundaries of all of the property involved in this dispute. The Baylinks were declared to be the "record owners in fee simple" of the disputed 30-foot strip, which was particularly described in the judgment. Defendants Rees, Tipton and Dominquez, and third-party defendants Morris were given a "nonexclusive easement for ingress and egress to their respective parcels" over the road on the Baylinks' 30-foot strip.

The trial court based its award of the easement to defendants on its conclusion that they had established an "historic use" of plaintiffs' property. The court explained:

"This court does not find that the defendants acquired an outright ownership interest with respect to the adverse action. However, it appears to this court that the evidence does establish a non-exclusive easement right to the road by Tipton/Dominquez and Rees. While this court does not recognize their adverse possession claim of ownership to the roadway, it does recognize their historic use of the roadway. This use has been demonstrated colorfully by Mr. Rees' conduct despite many warnings not to use the property by the Baylinks."

The only portion of the judgment that is challenged in this appeal is the grant of the easement on the road to defendants Rees and Tipton and Dominquez. The Baylinks contend that neither the Reeses nor Tipton and Dominquez have proven the necessary prerequisites to the establishment of a prescriptive easement. Specifically, the Baylinks contend that defendants failed to prove that they or their predecessors in interest used the roadway for a continuous period of 10 years as required by ORS 12.050. Further, they assert that the Reeses and Tipton and Dominquez did not establish that their use was adverse to the Baylinks' ownership. They also argue that defendants' use of the property that did occur was not open and notorious.

Easements by prescription are not favored by the law. *Wood v. Woodcock*, 276 Or 49, 56, 554 P2d 151 (1976). Parties claiming a prescriptive easement carry the burden of

proving their case by clear and convincing evidence. *Thompson v. Schuh,* 286 Or 201, 203, 593 P2d 1138 (1979) (citing *Thompson v. Scott,* 270 Or 542, 546-47, 528 P2d 509 (1974); *Cheney v. Mueller,* 259 Or 108, 124, 485 P2d 1218 (1971)). In order to establish an easement by prescription, the party asserting the easement must show open and notorious use of the land adverse to the rights of the title holder for a continuous and uninterrupted period of 10 years. *E.g., Arana v. Perlenfein,* 156 Or App 15, 19, 964 P2d 1125 (1998) (citing *Thompson v. Scott,* 270 Or at 546); *Winters v. Knutson,* 154 Or App 553, 558, 962 P2d 720 (1998) (same); ORS 12.050.

## I.  CLAIM BY THE REESES[2]

The Reeses argue that the evidence shows that they "used the disputed road in an open and notorious, continuous, and adverse manner for more than ten years." Carl Rees testified that he used the road without permission from the time that he moved onto his property in 1977. He said that he used the road to check his fences and to visit the Morrises. Carl Rees testified that he spread some rock on the road once and that he periodically maintained the road by smoothing it with his tractor blade and "busting out" snow drifts. He also testified that when he bought the property, Denfeld told him that the roadway was the Reeses' way of getting to the back of their property. Carl Rees stated that all three neighboring landowners used the road from at least 1984 forward.

The testimony of the Morrises also supports the Reeses' assertions. Phyllis Morris testified that, after the Reeses bought their property in 1977, she occasionally saw Carl Rees using the road to fix his fences. Victor Morris testified that Carl Rees started to use the road when the Reeses first bought the property. He stated that he saw Carl Rees use it "several times" to "check the upper half" and to get to the Victor property to help harvest hay.

---

[2] Defendants Rees and Tipton and Dominquez make several general assertions in their brief questioning the existence and ownership of the 30-foot strip of land on which the road at issue is located. However, as we have noted, the judgment declares the Baylinks to be the fee owners of this property and that portion of the judgment is not assigned as error on appeal. Accordingly, we do not address that question.

We find that the evidence establishes that, from the time that the Reeses moved onto the property in 1977 until this action was filed in 1993, Carl Rees used the road to check his fences, to bale hay, to check his cattle, and to visit the Morrises. Although this use was not constant, it was consistent with the "character of the property and the manner in which the average person would use it." *Arrien v. Levanger,* 263 Or 363, 369, 502 P2d 573 (1972). "Continuous use does not mean constant use; it refers only to the character of the user's state of mind and requires only that the alleged easement be used in a manner consistent with the needs of the user." *Kondor v. Prose,* 50 Or App 55, 59, 622 P2d 741 (1981). We conclude that the continuous and uninterrupted use requirements for the establishment of a prescriptive easement are satisfied here.

■      In order to satisfy the open and notorious requirement for a prescriptive easement, the Reeses' use of the road must have been such that the Baylinks had "a reasonable opportunity to learn of its existence and nature." *Thompson v. Schuh,* 286 Or at 211 (stating that although intermittent use may satisfy the continuous and uninterrupted use requirements, such use may also make it difficult to show that there was adequate notice of the use to satisfy the open and notorious requirements). In *Schuh,* the claimant presented evidence of a one-time logging operation and very infrequent inspection trips over the rest of the ten-year period. 286 Or at 212. In addition, other witnesses testified that there was no sign of the inspection trips until the end of the ten-year period. *Id.* The court held that, under those circumstances, even if continuous use were assumed "the open and notorious requirement of a prescriptive easement [was] not met[.]" *Id.*

In contrast, here, Jackman, Phyllis and Victor Morris, and Carl Rees all testified that Carl Rees began using the road after he purchased his property and that he continued to use it in the same manner until 1993. Both Katherine and Carroll Baylink also testified that they had, on occasion, seen Carl Rees using the road. Carl Rees did not use the road in a covert manner, and it appears that the only reason that he and the Baylinks did not see each other on the road more often was that the Baylinks did not live on the property and,

once they went over the hill onto their farm, they could no longer see the road. Based on this evidence, we conclude that the open and notorious requirements for a prescriptive easement are satisfied here.

■■ Generally, showing open, notorious, continuous and uninterrupted use of a road across another's land for more than 10 years creates a presumption that the use is adverse to the rights of the landowner. *Hayward v. Ellsworth*, 140 Or App 492, 497, 915 P2d 483 (1996). However, when dealing with the use of an existing road on the servient owner's land, we have held that, in the absence of any evidence of adverseness, it is reasonable to assume that use of an existing road over another's land is "pursuant to a friendly arrangement between neighbors." *Arana,* 156 Or App at 19-20 (quoting *Trewin v. Hunter,* 271 Or 245, 247, 531 P2d 899 (1975)). Accordingly, even if we assume here that the use was pursuant to a friendly agreement, the evidence here demonstrates to the contrary. Carl Rees specifically testified that he had never asked permission to use the road. Further, the Baylinks' own testimony shows that they considered Carl Rees's use of the road to be adverse. Carroll Baylink testified that when he saw Carl Rees using the gate to what was then the Jackman barn, he

> "stopped and told Carl that he could use our road but he needed to call us when he needed, when he used it. And that's all that was said * * * and I never did even get a phone call from him. And then some time went by and the same incidents happened again. I told Carl that he was trespassing and if he wanted to use the road he could but he needed to ask me but he never would."

Katherine Baylink testified that "[o]ne time up on the back fence, I saw him up on the back fence and I knew that he had gone up our road and through that way and I told him that he was trespassing." Based on all of the circumstances here, we hold that the Reeses used the road in an open, notorious and adverse manner for a continuous and uninterrupted period of 10 years. Accordingly, on *de novo* review, we conclude that the trial court's grant of a prescriptive easement to the Reeses was proper.

## II. THE TIPTON-DOMINQUEZ CLAIM

Tipton and Dominquez also argue that there is evidence in the record to support the conclusion that they, or their predecessors in interest, had "openly and continuously used the road in a manner consistent with their claim of right and color of title for more than ten years." Jackman, who owned the Tipton-Dominquez property immediately before Tipton and Dominquez, testified that he had farmed as an employee on the property during the 1960s. However, he did not buy the parcel until 1984. Jackman testified that throughout the time that he owned the property, he used the road. He thought that the fence on the south side of the road was on his property and that his property bounded on the Morrises' property on the north side of the road. Jackman testified that he and Carl Rees used the gates to access their properties from the north. He stated that using the gates was the only way to get access to the eastern portions of their properties because of a creek that runs through the properties.[3] Jackman also testified that he or his family members used the road to look at timber on the eastern portion of their property, to go up to an abandoned "dump," to go fishing, and to work on their fence. He also once grazed his horses for two or three weeks on the "grassy portion between the southern fence of [the] road and the gravel portion of the road." He testified that he asked Katherine Baylink before 1986 about riding horses on the property that she owned to the east but that they did not discuss the use of the disputed road.

Jackman further testified that his first confrontation with the Baylinks about the road took place in 1986. He had placed some railroad ties perpendicular to the road at the point where he planned to use them to replace the standards on both sides of the gate to his barn. When he came home, he found the ties "tipped in, rammed into the fence." He eventually heard that the Baylinks' son, Todd, had moved the ties. He stopped Todd as he came down the road and told him that he did not appreciate what he had done; that Jackman owned the road, and that the Baylinks were using the road "of my good will" and that Todd was welcome to continue to use the road, as long as he did not damage Jackman's property. Todd

---

[3] There is no claim before us that the road was a way of necessity.

told Jackman that the Baylinks owned the road. Jackman testified that this was the first time that he had heard anything like that.

In that same year, there was a second confrontation. The Baylinks moved some large equipment onto the road in preparation for removing a bridge and putting in a culvert. According to the Baylinks, they left to get a load of gravel, leaving a truck parked, for several hours, in front of the gate that led to Jackman's barn. When they returned, there was a note under their windshield from Jackman. The note said that they should keep their truck off of his property. Jackman testified that he put the note on their truck because it had blocked access from the road to his barn for about a week. Several days later, while Jackman was moving irrigation pipe, Carroll Baylink confronted him about the note and again disputed ownership of the road. In July 1986, the Baylinks sent Jackman a letter from their attorney. Jackman was advised not to use the strip of land or they would take legal action. Jackman said that he continued to use the road, despite the dispute over ownership, until he sold the property to Tipton and Dominquez in 1992.

Leslie Tipton testified that when he and his wife bought the property in 1992, they received a map as part of their title insurance policy. That map did not show a separate strip of land identified with a separate tax lot number. He stated that he understood that he was the owner of the road based on the map and the easement description in his deed. He used the road to check his cattle, mend fences, visit the Morrises, and go hiking. He said he used the road to mend his fences at least once a year and that he has never asked the Baylinks for permission to use the road. However, shortly after moving onto the property, he encountered Katherine and Todd Baylink on the road, and they told him that the road belonged to them. He testified that his use did not interfere with the Baylinks' use of the road.

■ We find that the evidence establishes that since the time that Tipton and Dominquez bought their parcel in 1992, they have used the road to get to their barn, to inspect the eastern portion of their property, to mend fences, to care for their cattle and to visit the Morrises. Further, we find that

the evidence shows that the Jackmans used the road to look at timber on their property, to go up to an abandoned "dump," to go fishing, and to work on their fences. This use which occurred from 1984 through 1992 demonstrates the kind of use necessary to establish "use" for purposes of a prescriptive easement in that it is the kind of use that a rural landowner would make of a roadway alongside his or her property. *See Davis v. Parke,* 135 Or App 283, 287, 898 P2d 804, *rev den* 321 Or 560 (1995) (finding that the plaintiffs put the land to the type of use that an owner would make of that type of land).

As discussed above, however, the establishment of a prescriptive easement requires adverse use of the property for a continuous and uninterrupted period of 10 years. Here, evidence of the use of the property by the Jackmans and Tipton and Dominquez only establishes use of the road for a period of nine years. The only testimony concerning use by predecessors in interest to the Jackmans came from Phyllis Morris who testified that the Denfelds' tenants "used" the road from 1972 through 1977, with one of the tenants walking along the road nearly every day and testimony from Carl Rees that he traveled the road with Ramsey, who purchased the Tipton-Dominquez parcel from Denfeld in 1977. A prescriptive easement must be proven by clear and convincing evidence. "[P]rescription * * * cannot be established by vague and general testimony purporting to describe the claimant's use." *Thompson v. Scott,* 270 Or at 548. There is no clear and convincing evidence establishing use in 1983. Accordingly, on *de novo* review, we are compelled to conclude that Tipton and Dominquez did not establish an essential element necessary to obtain a prescriptive easement over the road. *See Williams v. Harrsch,* 297 Or 1, 9, 681 P2d 119 (1984) (finding that the absence of evidence of use by previous owners to tack onto the plaintiff's use meant the plaintiffs failed to establish the requisite 10-year period).

### III. CLAIM BY THE MORRISES

Third-party defendants, appearing *pro se,* ask this court to modify the description of their property included in the trial court judgment. However, third-party defendants did not file a cross-appeal on this issue. Consequently, we are

unable to address that question and must affirm the trial court's order reforming the Morrises' parcels as described in the order.

Reversed with respect to the easement granted to respondents Leslie E. Tipton and Diana Dominquez; otherwise affirmed.